1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | No. M 07-1827 SI |
| | MDL. No. 1827 |
| _____/ | |
| This Order Relates to: | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS COMPLAINTS** |
| ALL CASES | |
| _____/ | |

Now before the Court are defendants' motions to dismiss the consolidated complaints filed by the direct and indirect purchaser plaintiffs. For the reasons set forth below, the Court concludes that the consolidated complaints meet the standard enunciated in *Bell Atlantic Corporation v. Twombly*, 127 S. Ct. 1955 (2007), because the complaints allege parallel conduct in addition to a number of other facts plausibly suggesting an agreement to fix prices. However, the Court agrees that as currently drafted, the consolidated complaints lack sufficient allegations specific to each defendant, and accordingly will GRANT defendants' motions in that respect and GRANT plaintiffs leave to amend. The Court finds that both the direct and indirect purchaser plaintiffs have sufficiently alleged antitrust standing. The Court also finds that, as a pleading matter, plaintiffs have sufficiently alleged fraudulent concealment such that it is inappropriate to dismiss any claims as time-barred. With regard to the indirect purchaser plaintiffs, the Court GRANTS in part and DENIES in part defendants' motions to dismiss various state law claims.

**BACKGROUND**

Defendants are a number of American and foreign companies that manufactured, sold and/or distributed Thin Film Transistor Liquid Crystal Display ("TFT-LCD") panels and products to customers throughout the United States. The direct purchaser plaintiffs filed this antitrust class action on behalf of all persons and entities who purchased a panel or product containing a TFT-LCD panel in the United States from the named defendants, any subsidiaries or affiliates thereof, or any co-conspirators as identified in the complaint, between January 1, 1996 and December 11, 2006. DP-CC ¶ 1. The indirect purchaser plaintiffs are fifty-four individuals and business entities who allege that they indirectly purchased LCD panels when they purchased products such as computer monitors, laptop computers, televisions, and mobile phones containing LCD panels, during roughly the same time period. IP-CAC ¶¶ 18-72.[1]

TFT-LCDs are used in a number of products, including but not limited to computer monitors, laptop computers, televisions, and cellular phones. According to the complaints, TFT-LCD panels are made by sandwiching liquid crystal compound between two pieces of glass called substrates. The resulting screen contains hundreds of thousands of electrically charged dots, called pixels, that form an image. The panel is then combined with a backlight unit, a driver, and other equipment to create a "module" allowing the panel to operate and be integrated into a television, computer monitor, or other product. The complaints allege that the core products during most of the class period were displays for laptop computers and computer monitors. DP-CC ¶ 86; IP-CAC ¶ 109.

Plaintiffs allege that the TFT-LCD industry has several characteristics that facilitated a horizontal conspiracy to fix prices, including "market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products." DP-CC ¶ 87.[2] Plaintiffs allege the following in support of the alleged conspiracy: (1) public signaling by defendants

---

[1] The indirect purchaser plaintiffs allege a class period extending from at least January 1, 1996 through at least December 31, 2006. IP-CAC ¶ 1.

[2] The indirect purchaser plaintiffs' consolidated amended complaint contains similar allegations.

1   and subsequent agreements to set output restrictions; (2) unexpected price stabilization and increases

2   at variance with the normal economic trends in a technology market; and (3) the creation and use

3   regional and global trade associations and cross-licensing and joint venture arrangements that

4   consolidated an already concentrated market.  The complaint also alleges government enforcement raids

5   and investigations in North America, Asia and Europe, including a pending criminal grand jury

6   investigation in this District, and the United States Department of Justice intervening to seek a complete

7   stay of discovery in this action.

8        The direct purchaser plaintiffs allege a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1.

9   The indirect purchaser plaintiffs seek federal injunctive relief under Section 16 of the Clayton Act, 15

10  U.S.C. § 26, and Section 1of the Sherman Act, as well as damages under numerous state laws.

11

12                                  **LEGAL STANDARD**

13       Dismissal of a complaint may be based "on the lack of a cognizable legal theory or the absence

14  of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d

15  696, 699 (9th Cir. 1990).  On a motion to dismiss, the Court accepts the facts alleged in the complaint

16  as true.  *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

17       Federal Rule of Civil Procedure 8 requires that a complaint contain a "short and plain statement

18  of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  "While a complaint

19  attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

20  obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and

21  conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic*

22  *Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).  The complaint must contain sufficient factual

23  allegations "to raise a right to relief above the speculative level."  *Id*. at 1965.

24

25                                    **DISCUSSION**

26  **I.    Direct purchaser plaintiffs' complaint**

27       **A.      Stating a claim under *Twombly***

28       Defendants contend that the direct purchaser plaintiffs' consolidated complaint should be

3

dismissed for failure to allege enough facts to demonstrate a plausible basis for a claim to relief under

Federal Rule of Civil Procedure 8 and *Twombly*. In attacking the complaint under *Twombly*, defendants

advance two primary contentions. First, defendants contend that the consolidated complaint fails to

allege evidentiary facts showing any actual agreement between defendants to engage in a price-fixing

conspiracy. Second, defendants argue that plaintiffs' allegations are at least equally consistent with

independent action and competition as they are with conspiracy in the TFT-LCD markets.

In *Twombly*, the Supreme Court clarified what a plaintiff must plead in order to state a claim

under Section 1 of the Clayton Act:

> [A] plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires
> more than labels and conclusions, and a formulaic recitation of the elements of a cause
> of action will not do, *see Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92
> L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a
> legal conclusion couched as a factual allegation"). Factual allegations must be enough
> to raise a right to relief above the speculative level. . . . In applying these general
> standards to a § 1 claim, we hold that stating such a claim requires a complaint with
> enough factual matter (taken as true) to suggest that an agreement was made. Asking for
> plausible grounds to infer an agreement does not impose a probability requirement at the
> pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that
> discovery will reveal evidence of illegal agreement. . . . [A]n allegation of parallel
> conduct and a bare assertion of conspiracy will not suffice.

*Twombly*, 127 S. Ct. at 1964-66.

The Court finds that, in general,[3] the complaint meets the standard articulated in *Twombly*. The

complaint alleges complex and unusual pricing practices by defendants, DP-CC ¶¶ 107, 112, 132, which

cannot be explained by the forces of supply and demand. The complaint alleges that in the pre-

conspiracy market, the industry faced declining TFT-LCD panel prices, which industry analysts

attributed to advances in technology and improving efficiencies. *Id.* ¶ 103. In addition, new companies

entered the market, resulting in increased competition and significant price declines. *Id.* ¶ 104. The

complaint alleges that beginning in 1996, however, the TFT-LCD product market has been

"characterized by unnatural and sustained price stability, as well as certain periods of substantial

increases in prices" *id.* ¶ 107, as well as a compression of price ranges for TFT-LCD products, which

is inconsistent with natural market forces. *Id.* ¶¶ 118, 127-28, 154-55. Plaintiffs allege that defendants

---

[3] As discussed *infra*, the Court agrees with defendants that the complaint as currently plead does
not contain sufficient allegations specific to each defendant.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

controlled prices by, *inter alia*, manipulating the capacity of various generations of fabrication plants, as well as the timing of bringing new capacity on line. *Id.* ¶ 108. Allegations of such unusual pricing practices state a cause of action under *Twombly*. *See Twombly*, 127 S. Ct. at 1965 n.4 (noting that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy"); *see also In re Graphics Processing Units Antitrust Litig.* ("*GPU II*"), 540 F. Supp. 2d 1085, 1092-1093 (N.D. Cal. 2007).

Citing a number of public statements by defendants, the complaint also alleges specific instances of invitations to agree and subsequent agreements. DP-CC ¶¶ 116-22, 148-52. For example, the complaint quotes a keynote address given by the President and CEO of the Semiconductor Division of Samsung Electronics Co., Ltd., which plaintiffs characterize as an effort to get other manufacturers in the industry to limit production, *id.* ¶ 116, as well as statements by an executive from Samsung that the company would raise prices and restrict production in 1999, *id.* ¶ 121, and several statements by AU Optronics boasting that it had succeeded in convincing its competitors to cut capacity. *Id.* ¶¶ 148-52 (alleging that after AU Optronics stated publicly that it was reducing production to avoid further price erosion, Chi Mei and Quanta Display announced plans to cut production). Courts have held that a conspiracy to fix prices can be inferred from an invitation, followed by responsive assurances and conduct. *See United States v. Foley*, 598 F.2d 1323, 1331-32 (4th Cir. 1979), *cert. denied*, 444 U.S. 1043 (1980) (upholding jury verdict in section 1 conspiracy case based upon evidence that one defendant stated his real estate firm was raising commissions, other defendants "expressed an intention or gave the impression that his firm would adopt a similar change," and then in following months defendants in fact took substantial numbers of higher commission listings); *see also Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965).

In addition, the complaint alleges that defendants offered pretextual reasons for price increases or output restrictions, which also supports an inference of concerted action. *See In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 53, 60 (E.D. Pa. 2007) ("*Linerboard II*"). The complaint also alleges that defendants exchanged numerous types of sensitive competitive information, including pricing information, through trade association meetings, private communications and published data.

1   DP-CC ¶¶ 90-91, 156-69, 194.  "[W]hen allegations of parallel conduct are set out in order to make a

2   § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely

3   parallel conduct that could just as well be independent action."  *Twombly*, 127 S. Ct. at 1966.  The Court

4   finds that taking all of plaintiffs' allegations together, plaintiffs have met this standard.

5

6           **B.       Separate motions to dismiss**

7           Several defendants have also filed separate motions to dismiss contending that the complaint is

8   deficient in ways specific to those defendants.  These defendants contend that the complaint is lacking

9   because, for example, it does not contain individualized allegations about each NEC or Hitachi corporate

10  entity, and instead generally refers to "NEC" or "Hitachi."  Similarly, IPS Alpha contends that the

11  complaint's general allegations as to all defendants or all Japanese defendants, and the complaint's

12  allegations as to other entities involved in the formation of IPS Alpha, fail to establish a plausible

13  conspiracy claim against IPS Alpha.

14          Plaintiffs contend that the complaint need not contain detailed "defendant by defendant"

15  allegations.  While this is true, the Court agrees with defendants that the complaint "must allege that

16  each individual defendant joined the conspiracy and played some role in it because, at the heart of an

17  antitrust conspiracy is an agreement and a conscious decision by each defendant to join it."  *In re Elec.*

18  *Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 311-12 (D.N.J. 2004) (citing *Jung v. Assoc. of Am.*

19  *Med. Colls.*, 300 F. Supp. 2d 119, 163-64 (D.D.C. 2004) (internal quotation marks omitted)).  The Court

20  agrees that general allegations as to all defendants, to "Japanese defendants," or to a single corporate

21  entity such as "Hitachi" is insufficient to put specific defendants on notice of the claims against them.

22  Similarly, although plaintiffs assert in their opposition that the complaint is sufficient as to IPS Alpha

23  because IPS Alpha was created as a joint venture consistent with a strategy to curtail supply, the

24  complaint actually only alleges that IPS Alpha was formed "to manufacture and sell TFT-LCD panels

25  for televisions."  DP-CC ¶ 60.

26          The Court GRANTS plaintiffs leave to amend the complaint to more specifically plead how each

27  individual defendant joined the alleged price-fixing conspiracy.  In amending the complaint, plaintiffs

28  need not plead each defendant's involvement in the alleged conspiracy in elaborate detail, but must

**United States District Court**
For the Northern District of California

1    simply include allegations specific to each defendant alleging that defendant's role in the alleged

2    conspiracy.

3        Epson Electronics America additionally moves to dismiss the complaint on the ground that its

4    business is limited to the market for "small" TFT-LCD panels and plaintiffs' allegations are directed

5    at the "large-area" market.  The Court finds this contention incorrect as a pleading matter, as the direct

6    purchasers' complaint does allege a conspiracy to set prices for all TFT-LCD panels and products

7    incorporating those panels, DP-CC ¶ 1.  Further, at this stage of the litigation the Court's review is

8    limited to the pleadings, and the Court may not consider factual assertions about the nature of Epson's

9    business.

10

11        **C.    Standing**

12        Defendants also contend that the direct plaintiffs' claims based on purchases of finished products

13   containing TFT-LCD panels should be dismissed for lack of antitrust standing under *Associated General*

14   *Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").

15   Defendants argue that the direct plaintiffs which purchased finished products fail to meet their burden

16   of pleading antitrust standing because they do not allege participation in the market for raw TFT-LCD

17   panels.  Defendants argue that the term "TFT-LCD product" is an artificial one designed to sweep

18   together both TFT-LCD panels and finished products containing them, but that the complaint only

19   alleges anticompetitive conduct in the markets for the raw panels.

20        Citing *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470-71 (9th Cir. 1985), defendants argue

21   that market participation under *AGC* requires that the products or services at issue be reasonably

22   interchangeable or have cross-elasticity of demand.  Defendants contend that the complaint does not

23   allege any "reasonable interchangeability" or "cross-elasticity of demand" between finished products

24   containing TFT-LCD panels and the allegedly restrained TFT-LCD panels.  Defendants argue that the

25   addition of numerous components to a TFT-LCD panel to create a finished product (such as the addition

26   of a backlight unit, a driver and other equipment to create a notebook computer) demonstrates that the

27   two are not reasonably interchangeable.  However, while *Bhan* remains good law, the Court notes, as

28   did Judge Hamilton in *In re DRAM Antitrust Litigation*, 536 F. Supp. 2d 1129 (N.D. Cal. 2008), that

**United States District Court**
For the Northern District of California

7

there is "no subsequent Ninth Circuit authority that affirmatively endorses a general rule applying *Bhan*'s reasonably interchangeable and cross-elastic requirements to the market participant inquiry in section 1 cases." *Id*. at 1138 (explaining that reasonable interchangeability of use and cross-elasticity of demand are concepts traditionally important in section 2 cases where "definition of the 'relevant market' is key").

In *AGC*, the Supreme court articulated a number of factors that courts should consider when evaluating whether a plaintiff has antitrust standing. The Court identified the "nature" of the injury as the most important factor, specifically whether it is "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *AGC*, 459 U.S. at 538 (quoting *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 482 (1982)). The Court also instructed that courts should consider whether "a causal connection [exists] between an antitrust violation and the harm to the [plaintiff]," *id*. at 537; whether "the defendants intended to cause that harm," *id*.; whether the plaintiff was "a consumer [or] a competitor in the market in which trade was restrained," *id*. at 539; whether the interests of the plaintiff would be served by remedying the violation, *id*.; the directness or indirectness of the alleged injury, *id*. at 540; and whether there are more immediate victims of the violation, such that denying standing to the plaintiff would not "leave a significant antitrust violation undetected or unremedied." *Id*. In addition, the Court stated that courts should evaluate whether the plaintiff's damages are speculative and whether the plaintiff's claim would potentially lead to duplicative recovery or the complex apportionment of damages. *Id*. at 543 (citing *Illinois Brick*, 431 U.S. at 737-38).

Here, the complaint alleges that the direct purchaser plaintiffs purchased TFT-LCD products directly from cartel members at supra-competitive prices as the result of a conspiracy to fix prices. DP-CC ¶¶ 9-20. Defendants do not cite any case holding that a plaintiff who purchases directly from an alleged cartel does not have standing. In contrast, courts have found antitrust standing where plaintiffs purchased downstream goods from a cartel of manufacturers who made, and fixed the price of, a component of those goods. *See, e.g., In re Linerboard Antitrust Litig*., 305 F.3d 145, 159-60 (3d Cir. 2002) ("*Linerboard I*") (in alleged conspiracy to fix prices of linerboard, plaintiffs who purchased corrugated sheets or boxes containing linerboard directly from defendants had standing). To the extent that defendants raise questions about the scope of the market, or contend that damages will be difficult

**United States District Court**
For the Northern District of California

1   to ascertain, the Court finds that these are factual questions that are better addressed on a fuller record,

2   and not at the pleadings stage.  *See In re Sugar Industry Antitrust Litig.*, 579 F.2d 13, 17 (3d Cir. 1978)

3   ("As the defendants here point out, the product which plaintiff purchased competes not with sugar, but

4   with other candy, and more than one ingredient determines the price. To this extent, there will be some

5   additional complications underlying the damage claims. However, this must not be allowed to obscure

6   the fact that the plaintiff did purchase directly from the alleged violator.").

7

8        **D.        Statute of limitations**

9        Antitrust actions under the Clayton Act are subject to a four year statute of limitations. *See* 15

10  U.S.C. § 15(b) (2002); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).  The complaint was filed

11  on December 13, 2006, and alleges a class period beginning January 1, 1996.   Defendants move to

12  dismiss any claims for recovery for injuries based on sales that occurred more than 4 years before the

13  filing of the complaint.[4]

14       Plaintiffs contend that they have plead specific acts of fraudulent concealment on the part of

15  defendants and that plaintiffs did not have constructive notice of the conspiracy, and thus that the statute

16  of limitations was tolled.  A plaintiff alleging fraudulent concealment must plead with particularity "the

17  circumstances of the concealment and the facts supporting [the plaintiff's] due diligence."  *Conmar*

18  *Corporation v. Mitsui & Company (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988).  In *Conmar*, the

19  plaintiff alleged that the defendants had violated the Clayton Act by "dumping" steel products in the

20  United States through, *inter alia*, falsification of customs documents.  *Id.* at 501.  On summary

21  judgment, the defendants argued that the plaintiff's claims were time-barred because the defendants'

22  indictments for customs violations and other matters in the public record, which all occurred more than

23  four years before the filing of the complaint, put the plaintiff on notice of its claims.  The district court

24  agreed and granted summary judgment in favor of the defendant, finding that the plaintiff had not

25  demonstrated due diligence in pursuing its claims.  *Id.* at 502, 504. The Ninth Circuit reversed, finding

26  that there were genuine issues of fact as to whether the publicly available information, including the

27

28       [4]  Some defendants were not named in the initial complaint, and thus the limitations period for
those defendants is different.

1    indictments, was sufficient to put the plaintiff on notice of its claims. *Id*. at 504. The court also held

2    that "because we find that there is a genuine issue of material fact whether the facts publicly available

3    were sufficient to excite Conmar's inquiry, then no due diligence need be demonstrated for Conmar to

4    survive summary judgment." *Id*. at 505.

5        Here, the complaint alleges many acts of fraudulent concealment during the relevant period,

6    including defendants providing numerous specific pretextual reasons for the inflated prices of LCDs.

7    DP-CC ¶¶ 179-87 (reasons such as undercapitalization leading to insufficient capacity, undersupply due

8    to demand for larger panels, shortages due to late expansion of production lines, and rapid demand

9    growth). The complaint also alleges that plaintiffs were unaware of their claims and discovered them

10   as a result of investigations by the DOJ and other antitrust regulators in December 2006. *Id*. ¶¶ 171-77,

11   178. In addition, the complaint alleges that "Defendants engaged in a secret conspiracy that did not give

12   rise to facts that would put plaintiffs or the Class on inquiry notice that there was a conspiracy to fix

13   prices for TFT-LCDs," *id*. ¶ 178, and that defendants agreed "not to publicly discuss the nature of the

14   scheme and gave pretextual justifications for the inflated prices of TFT-LCDs in furtherance of the

15   conspiracy." *Id*. ¶ 179. Plaintiffs allege that in this context, they "could not have discovered through

16   the exercise of reasonable diligence" the alleged conspiracy." *Id*. ¶ 178.

17       The Court finds that plaintiffs have sufficiently alleged fraudulent concealment and that it would

18   be inappropriate to dismiss any claims as time-barred at this stage of the litigation. "[I]t is generally

19   inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss

20   stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be

21   largely in the hands of the alleged conspirators." *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp.

22   2d 777, 789 (N.D. Cal. 2007); *see also Conmar*, 858 F.2d at 504-05. Defendants may renew these

23   contentions upon a fuller factual record.

24

25   **II.    Indirect purchaser plaintiff's complaint**

26       **A.    Stating a claim under *Twombly***

27       Defendants move to dismiss the indirect purchaser plaintiffs' consolidated amended complaint

28   on the ground that they have failed to state a an antitrust conspiracy claim under *Twombly*. The indirect

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    purchaser plaintiffs' complaint contains allegations about defendants' conduct similar to the direct

2    purchaser' conspiracy allegations, which this Court has already found sufficient. However, as with the

3    motions to dismiss the direct purchaser complaint, the Court finds that while conspiracy allegations need

4    not be detailed defendant-by-defendant, the indirect purchaser plaintiffs must include allegations

5    specific to each defendant alleging that defendant's role in the alleged conspiracy. Accordingly, the

6    Court GRANTS in part and DENIES in part defendants' motions in this regard.

7

8    **B.    Standing**

9        In *Illinois Brick Company v. Illinois*, 431 U.S. 720, 730 (1977), the Supreme Court held that

10    indirect purchasers generally may not sue for money damages under Section 4 of the Clayton Act. In

11    response to *Illinois Brick*, some states passed "repealer" statutes expressly allowing indirect purchasers

12    to recover money damages for antitrust violations under state law. *See, e.g.*, California Cartwright Act,

13    Cal. Bus. & Prof. Code § 16720.

14        Defendants move to dismiss on standing grounds the indirect plaintiffs' claims under the laws

15    of 15 "repealer states": (1) antitrust claims under the laws of Arizona, California, Iowa, Kansas, Maine,

16    Michigan, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, South Dakota,

17    West Virginia and Wisconsin, and (2) consumer protection claims under the laws of Nebraska, New

18    York and North Carolina. Defendants contend that each of the repealer states applies the standing

19    analysis established in *AGC*, 459 U.S. 519 (1983), and that under *AGC* indirect plaintiffs lack standing

20    because they are not participants in the allegedly restrained markets for TFT-LCD panels, and instead

21    have only participated in the markets for finished products containing TFT-LCD panels. Defendants

22    also contend that indirect plaintiffs lack standing because any potential harm to indirect plaintiffs is too

23    attenuated and inadequately pled.

24        The parties dispute whether it is appropriate to apply the *AGC* test to evaluate indirect plaintiffs'

25    standing in the repealer states, as well as what conclusion this Court should draw if it were to apply

26

27

28

United States District Court
For the Northern District of California

*AGC*.[5]  Defendants urge this Court to follow Judge Hamilton's decision in *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation* ("*DRAM I*"), 516 F. Supp. 2d 1072 (N.D. Cal. 2007), and *DRAM II*, 536 F. Supp. 2d 1129 (N.D. Cal. 2008).  In *DRAM I*, Judge Hamilton held that the indirect plaintiffs proceeding under 14 state antitrust statutes, including California, were required to meet the *AGC* standing test.  In reaching this conclusion, Judge Hamilton relied on either state court decisions applying *AGC* or harmonization provisions within the state antitrust statutes calling for the statutes to be construed in accordance with federal law.  *DRAM I*, 516 F. Supp. 2d at 1088-89, 1093-95.

In applying *AGC* to the indirect plaintiffs' claims, Judge Hamilton found standing lacking largely because the indirect plaintiffs had failed to allege the first *AGC* factor, antitrust injury.  The court found that because the indirect plaintiffs purchased DRAM as a component of other products, such as computers, those plaintiffs did not participate in the alleged market for DRAM, and thus lacked injury because "they do not have grounds from which to argue that they are participants in the allegedly restrained market."  *Id*. at 1090.  After the indirect plaintiffs amended their complaint, Judge Hamilton dismissed the amended state antitrust claims without leave to amend.  *DRAM II*, 537 F. Supp. 2d at 1140-41.  Judge Hamilton found the indirect plaintiffs' allegations that the DRAM and computer markets are "inextricably" linked did not sufficiently allege that the plaintiffs were participating in the "same market" as the allegedly restrained DRAM market.  *Id*.  Judge Hamilton noted that the case law "provides no ready answer" to the question since "it neither convincingly requires allegations of reasonable interchangeability and cross-elasticity of demand in order to allege participation in the 'same market,' and furthermore appears to limit findings of antitrust injury in cases alleging 'inextricably linked' injuries, to situations in which the victims are either direct victims of the conspiracy, or the actual means by which a given conspiracy is effectuated."  *Id*. at 1140.  However, Judge Hamilton ultimately concluded that the plaintiffs' allegations were insufficient based on case law reiterating the "same market" language in discussing the market participant requirement, and also because of the "risk of opening the floodgates to potential litigation" because "[i]n today's current business climate . . .

---

[5]  In addition, the State of California has filed an *amicus* brief arguing that plaintiffs in a component-cost pass-on case such as the instant one have standing under California law to pursue their claims under California's Cartwright Act.  The California Attorney General also argues that even if the Court applied the *AGC* factors, plaintiffs have would have standing in such a case.

United States District Court
For the Northern District of California

nearly all markets that service one another can be said to be 'related' to such a degree that the impact of one upon another could allegedly be 'proven' with the use of econometrics."[6]

Here, plaintiffs urge that it is inappropriate to apply *AGC* to evaluate standing under  state antitrust statutes in the absence of a clear directive from either the state Supreme Courts or the state legislatures.  Further, plaintiffs argue that to the extent that any of the state-law claims so require, the complaint alleges facts satisfying each of the *AGC* factors.  Plaintiffs cite several decisions in which courts have rejected a bright-line "market-participant" test, and allowed claims by indirect purchasers based on purchases of finished products containing allegedly-restrained products.  *See, e.g.*, *D.R. Ward Constr. Co. v. Rohm & Haas, Co.*, 470 F. Supp. 2d 485, 491 (E.D. Pa. 2006) (holding plaintiffs had standing because, *inter alia*, "plaintiffs allege that they paid an inflated price for plastics additives due to defendants' price-fixing agreement, thereby implying that the direct harm of the price-fixing conspiracy was passed through the stream of commerce to them, purchasers of products containing plastics additives."); *see also In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 410 (D. Del. 2007).

Plaintiffs also cite Judge Alsup's decision in *GPU*, in which he held that the claims of indirect purchasers of graphics computer chips could go forward even though the indirect purchasers, like indirect plaintiffs here, bought the allegedly price-fixed product (GPU chips) as a component of another product (i.e., video games), at a distribution level different from the one in which defendants sold the price-fixed product.  Noting that *AGC* arose under the federal Clayton Act, Judge Alsup stated that "[i]t is far from clear that *Associated General Contractors* should be automatically read into the substantive antitrust law of each and every state."  *GPU I*, 527 F. Supp. 2d 1011, 1025 (N.D. Cal. 2007).  In rejecting the argument advanced by defendants here, Judge Alsup held:

> Standing under each state's antitrust statute is a matter of that state's law.  It would be wrong for a district judge, in *ipse dixit* style, to bypass all state's legislatures and all state appellate courts and to pronounce a blanket and nationwide revision of all state antitrust laws.  The rule urged by the defense may (or may not) be sound policy but that is a matter for the state policy makers to decide, not for a federal judge to impose by fiat.

---

[6] Judge Hamilton noted that her ruling "is not without controversy or uncertainty, given the state of the law on the issues raised herein with respect to antitrust injury."  *DRAM II*, 536 F. Supp. 2d at 1142.  By order filed June 26, 2008, the Ninth Circuit Court of Appeals granted the indirect plaintiffs permission to appeal Judge Hamilton's order pursuant to 28 U.S.C. § 1292(b).

**United States District Court**
For the Northern District of California

*Id*. at 1026.  Judge Alsup rejected a blanket nationwide application of *AGC* without prejudice to a subsequent state-by-state analysis of the extent to which *AGC* had actually been adopted by state officials.  *Id*.

In a later opinion, Judge Alsup did exactly that.  The *GPU* defendants "repackaged" their *AGC* arguments and contended, as defendants do here, that 14 states had adopted *AGC* as the test for standing.[7]  *GPU II*, 540 F. Supp. 2d at 1097. Judge Alsup found that the Supreme Courts of Iowa and Nebraska had explicitly endorsed the *AGC* test for standing, and thus that it was appropriate to apply that test to evaluate the plaintiffs' claims under those states' law.  *Id*. at 1097 (citing *Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192, 199 (Iowa 2007), and *Kanne v. Visa U.S.A., Inc.*, 723 N.W.2d 293, 302-03 (Neb. 2006)).  Judge Alsup found that "[i]n the other states, the law is less clear cut," noting that in some states (California, Arizona, Maine, Michigan, South Dakota), some intermediate appellate courts had used the *AGC* test but that "[t]his is not the same as showing that *AGC* has been adopted as the law of those states."  *Id*. at 1097.  With regard to the remaining states, Judge Alsup found:

> [N]o state court in New Mexico or West Virginia has reached the question of whether *AGC* applies.  Both of those states have harmonization provisions, or statutes that require or urge that state antitrust statutes should be interpreted consistent with federal antitrust precedent.  Not all such statutes are equivalent in language or in application, and defendants do not argue how much those statutes require in terms of harmonization.  Absent clearer directive from the courts and legislatures of those states, this order declines to hold that *AGC* is the laws of those states at this time.  Finally, defendants also acknowledge that the antitrust statutes of Mississippi, Kansas, and Tennessee do not contain harmonization provisions.  The "favorable citations" and references to federal antitrust standing are not sufficient to mandate that the *AGC* test applies.

*Id*.

The Court agrees with Judge Alsup that it is inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the repealer states' laws in the absence of a clear directive from those states' legislatures or highest courts.  Nevertheless, the Court finds that even if the *AGC* test did apply, indirect plaintiffs in this case have alleged facts showing that they have standing under that test, at least at the pleading stage.  Under *AGC*, courts consider (1) the nature of plaintiffs' injuries and whether plaintiffs

---

[7]  Twelve of those states at issue in *GPU* are also at issue here: Arizona, California, Iowa, Kansas, Maine, Michigan, Mississippi, Nebraska, New Mexico, South Dakota, West Virginia and Wisconsin.  In addition, *GPU* involved Tennessee and the District of Columbia.  Judge Alsup did not evaluate New York, North Carolina, and North Dakota.

were participants in the relevant markets; (2) the directness of the alleged injury; (3) the speculative nature of the alleged harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *AGC*, 459 U.S. at 536-39.

With regard to the first factor, defendants strenuously argue that indirect plaintiffs are not participants in the relevant market, namely the market for TFT-LCD, since they purchased finished products containing TFT-LCD panels. Plaintiffs allege that "market for LCD panels and the market for the products into which they are placed are inextricably linked and intertwined because the LCD panel market exists to serve the LCD products market." IP-CAC ¶ 133. Plaintiffs also allege the LCD panels "have no independent utility, and have value only as components of other products, such as TVs, computer monitors, and laptops. The demand for LCD panels thus directly derives from the demand for such products." *Id*. ¶ 132. The Court finds that there are factual questions about the relevant market, and it may be, as plaintiffs allege, that the indirect purchaser plaintiffs "have participated in the market for LCD panels through their purchases of products containing such panels." *Id*. ¶ 134. Or, it may be that indirect purchasers have participated in an analytically distinct market for finished products. In any event, the Court finds that plaintiffs' allegations are sufficient at this stage to weigh in favor of standing under the first factor of *AGC*.

Moreover, even if plaintiffs are not participants in the relevant market, they have also alleged that TFT-LCD panels are "identifiable, discrete physical objects that do not change form or become an indistinguishable part of the TVs, computer monitors, laptops, or other products in which they are contained," and "[t]hus, LCD panels follow a traceable physical chain from the defendants to the OEMs to the purchasers of the finished products incorporating LCD panels." *Id*. ¶¶ 199-200. Plaintiffs also allege that "just as LCD panels can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of LCD panels affect prices paid by indirect purchasers of products containing LCD panels." *Id*. ¶ 201. In *GPU*, Judge Alsup found that similar allegations "slightly favor standing" under the first factor of *AGC*, notwithstanding the fact that the indirect plaintiffs there may not participate in the relevant market. *See GPU II*, 540 F. Supp. 2d at 1098.

The Court finds that the complaint also satisfies the remaining *AGC* factors. On the second

factor, defendants contend that the indirect plaintiffs' injuries are too indirect because a variety of manufacturing, distribution, and retail sales channels separate the indirect plaintiffs' alleged injury from the allegedly restrained markets for TFT-LCD panels. However, the complaint alleges that the costs of LCD panels are traceable in prices of LCD products, IP-CAC ¶¶ 199-215; that LCD panels make up 60-70% of the cost of an LCD television or computer monitor, *id*. ¶ 182; that the distribution chain for LCD panels is short in that LCD products are sold either directly to end users by direct purchasers such as OEMs or through an intermediary retailer, *id*. ¶¶ 188-91; and that a large percentage of LCD products were sold by the first purchaser of LCD panels (e.g, Dell or Gateway) directly to class members. *Id*. ¶ 205. The Court finds that plaintiffs have sufficiently alleged that the price of LCD panels is traceable. *See GPU II*, 540 F. Supp. 2d at 1098.

As to the third factor, defendants contend that the indirect plaintiffs' harm is too speculative because they purchased finished consumer products containing numerous components in addition to TFT-LCD panels, and because there are many different links in the distribution channels. The Court finds that, as a pleading matter, plaintiffs have sufficiently alleged that overcharges are passed on to consumers, and that such overcharges can be traced through the relatively short distribution chain. Moreover, the Court finds that it would be inappropriate to determine "complex and intensely factual" damages issues without "a more fully developed factual record." *Intel*, 496 F. Supp. 2d at 410; *see also GPU II*, 540 F. Supp. 2d at 1098. Relatedly, on the fourth and fifth factors, the Court finds that plaintiffs have sufficiently alleged that damages are traceable and thus apportionable because LCD panels are a separate component.

In sum, the Court finds that the indirect plaintiffs have demonstrated standing because they have alleged the kind of injury that the antitrust laws were intended to address, namely that they were overcharged for products containing TFT-LCD panels as a result of defendants' horizontal price-fixing agreement. Defendants may renew their challenges to standing upon a fuller factual record. However, at the pleadings stage, the Court finds that plaintiffs have sufficiently established standing to allege their claims.

### C.     Common law claim for unjust enrichment

In their second claim for relief, the indirect plaintiffs seek disgorgement of profits under "common law principles of unjust enrichment" on behalf of a nationwide class.  IP-CAC ¶¶ 244-45.  Defendants move to dismiss this claim because plaintiffs do not identify which states' laws give rise to plaintiffs' claims.  Defendants also contend that a nationwide claim under a single state's unjust enrichment law would be inappropriate.

Plaintiffs respond that in light of Judge Wilken's decision in *In re Static Random Access Memory (SRAM) Antitrust Litigation*, 2008 WL 426522 (N.D. Cal. Feb. 14, 2008), dismissing a similar claim, plaintiffs agree that the complaint must be more specific and they seek leave to amend to identify under which states' unjust enrichment laws plaintiffs will proceed.  Accordingly, the Court GRANTS defendants' motion in this respect and GRANTS plaintiffs leave to amend this claim.  If plaintiffs allege an unjust enrichment claim under a single state's unjust enrichment law, defendants may renew their contentions at that time or in connection with class certification.

### D.     Claims under non-California law in states where no named plaintiff resides

Defendants move to dismiss the indirect plaintiffs' claims under Mississippi, Nebraska, New Hampshire, Pennsylvania and Rhode Island law because no named plaintiff resides in those states.  In light of Judge Alsup's decision in *GPU*, plaintiffs agree to dismissal of these claims and seek leave to amend to add a class representatives for these states.  Accordingly, the Court GRANTS defendants' motion in this respect and GRANTS plaintiffs leave to amend.

### E.     Indirect plaintiffs' claims under consumer protection laws of Arkansas, D.C., Kansas, Maine, Nebraska, New Mexico, New York, Pennsylvania, Rhode Island and West Virginia

Defendants contend that the consumer protection laws of Arkansas, D.C., Kansas, Maine, Nebraska, New Mexico, New York, Pennsylvania, Rhode Island, and West Virginia do not encompass price-fixing.

United States District Court
For the Northern District of California

1               **1.**      **Ark. Code Ann. § 4-88-101,** *et seq.*

2       The Arkansas Deceptive Trade Practices Act ("ADTPA") prohibits certain enumerated

3 "[d]eceptive and unconscionable trade practices," as well as "any other unconscionable, false, or

4 deceptive act of practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a). The ADTPA

5 also prohibits "[t]he act, use, or employment by any person of any deception, fraud, or false pretense

6 [and] . . . [t]he concealment, suppression, or omission of any material fact with the intent that others rely

7 upon the concealment, suppression, or omission." *Id.* §§ 44-88-108.

8       The indirect plaintiffs allege that defendants' anticompetitive conduct constituted deceptive and

9 unconscionable conduct in violation of the ADTPA's "catch-all provision," § 4-88-107(a)(10) to the

10 detriment of the Arkansas class. IP-CAC ¶ 270(d), (e). The complaint alleges that defendants

11 "deliberately failed to disclose material facts" about their anticompetitive actions to the Arkansas

12 indirect purchaser class, that they owed a duty to disclose such facts, and that they "breached that duty

13 by their silence," since the class members typically lacked sophistication. *Id.* ¶ 270(b). The complaint

14 alleges that defendants misrepresented that LCD prices were "competitive and fair," and thus misled

15 consumers into believing that these prices were the result of a "free and fair market." *Id.* ¶ 270(b), (e).

16       Defendants move to dismiss this claim on the ground that the statute does not reach the price-

17 fixing conduct alleged here. Defendants note that the statute imposes no duty to "disclose" material

18 facts to Arkansas consumers. Plaintiffs have not cited any Arkansas authority construing the Arkansas

19 statute in such a manner, or interpreting the statute to apply to price-fixing. In the absence of any such

20 authority, the Court is unwilling to expansively interpret the statute as plaintiffs suggest. The Court

21 GRANTS defendants' motion. *See also GPU I*, 527 F. Supp. 2d at 1029-30 (dismissing claims under

22 Arkansas statute).

23

24              **2.**      **D.C. Code § 28-3904**

25       Plaintiffs allege that "[d]efendants agreed to, and did in fact, act in restraint of trade or commerce

26 by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices

27 at which LCD was sold, distributed or obtained in the District of Columbia" and that "[t]he foregoing

28 conduct constitutes 'unlawful trade practices'" within the meaning of the District of Columbia's

Consumer Protection Practices Act ("DCCPPA"). IP-CAC ¶ 272(a)-(b). Defendants move to dismiss this claim on the ground that none of the claims alleged by the D.C. plaintiffs describes conduct specifically prohibited by the statute.

Plaintiffs assert that the DCCPPA was intended to protect consumers from a broad spectrum of deceptive trade practices, and thus that defendants' conduct falls within the purview of the statute. Plaintiffs are correct that courts have interpreted the DCCPPA very broadly. "The Consumer Protection Procedures Act is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers." *Atwater v. District of Columbia Dep't of Consumer & Reg. Affairs*, 566 A.2d 462, 465 (D.C. 1989). "While the CPPA enumerates a number of specific unlawful trade practices, see D.C. Code § 28-3904, the enumeration is not exclusive." *District Cablevision Ltd. Partnership v. Bassin*, 828 A.2d 714, 723 (D.D.C. 2003) (citing *Atwater*, 566 A.2d at 465). "A main purpose of the CPPA is to 'assure that a just mechanism exists to remedy *all* improper trade practices.'" *Id*. (citing D.C. Code § 28-3901(b)(1)) (emphasis added). "Trade practices that violate other laws, including the common law, also fall within the purview of the CPPA." *Id*.; *see also Osbourne v. Capital City Mortg. Corp*., 727 A.2d 322, 325-26 (D.C. 1999) ("[T]he CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by § 28-3904, but to all other statutory and common law prohibitions.").

In light of this case law expansively interpreting the DCCPPA as a "comprehensive" statute designed to remedy "all improper trade practices," the Court finds that plaintiffs may maintain a claim for defendant's alleged price-fixing under the statute, and accordingly, DENIES defendants' motion. *See In re New Motor Vehicles Canadian Export Antitrust Litig.* ("*NMV*"), 350 F. Supp. 2d 160, 182-83 (D. Me. 2004). Because "the alleged antitrust violation may violate the DCCPPA without being a deceptive practice," the Court also finds that plaintiffs are not required to meet a heightened pleadings standard. *Id*. at 182-83 n.36.

### 3.    Kansas Stat. Ann. § 50-626

Plaintiffs do not oppose dismissal of their claim under this statute. Accordingly, the Court GRANTS defendants' motion to dismiss this claim.

19

1        **4.    Maine Rev. Stat. § 207,** *et seq.*

2        Maine's Unfair Trade Practices Act ("UTPA") forbids "[u]nfair methods of competition and

3 unfair or deceptive acts or practices in the conduct of any trade or commerce." Me. Rev. Stat. Ann. Tit.

4 5, § 207. Plaintiffs allege that defendants' alleged price-fixing constitutes an "unfair method of

5 competition." Citing the Maine Supreme Court's decision in *Tungate v. Maclean-Stevens Studios, Inc.*,

6 714 A.2d 792 (Me. 1998), defendants argue that plaintiffs cannot state a claim because "[i]n pricing

7 cases under the Act the inquiry is whether the price has the effect of deceiving the consumer, or inducing

8 her to purchase something that she would not otherwise purchase." *Id.* at 797. Plaintiffs contend that

9 *Tungate* only involved the portion of the UTPA relating to unfair or deceptive acts, while plaintiffs'

10 claim is under the "unfair methods of competition" portion of the UTPA. The Court is not persuaded

11 that *Tungate* is so limited, since the *Tungate* court broadly stated "[m]oreover, to the extent that her

12 complaint is based on what she considers unfair pricing, Tungate's reliance on the UTPA is further

13 misplaced" and also framed its holding by generally stating the requirements for "pricing cases under

14 the Act." *Id.*

15        Here, the complaint does not allege that the prices of LCD products had the effect of deceiving

16 plaintiffs or inducing them to purchase something they would not otherwise purchase. Moreover, as

17 Judge Alsup stated in dismissing the plaintiffs' claims under the Maine statute in *GPU*, "the *higher*

18 prices plaintiffs allegedly paid for GPUs because of the price-fixing conspiracy could not have induced

19 plaintiffs to purchase them." *GPU I*, 527 F. Supp. 2d at 1031. Accordingly, the Court GRANTS

20 defendants' motion in this respect. Leave to amend is granted, but only if plaintiffs can allege actions

21 and consequences that will bring them squarely within the ambit of the statute.

22

23        **5.    Nebraska Rev. Stat. §§ 59-1601** *et seq.*

24        The Nebraska Consumer Protection Act ("CPA"), Neb. Rev. Stat. § 59-1602, includes both

25 antitrust and consumer protection aspects. *See id.* ("Unfair methods of competition and unfair or

26 deceptive acts or practices in the conduct of any trade or commerce shall be unlawful . . . Any contract,

27 combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be

28 unlawful."). Defendants move to dismiss plaintiffs' claim solely on the ground that plaintiffs lack

1    standing under *AGC*.  For the reasons stated *supra*, the Court finds that plaintiffs do have standing, and

2    thus DENIES defendants' motion to dismiss this claim.[8]

### 6.    New Mexico Stat. §§ 57-12-1 *et seq.*

5    The New Mexico Unfair Practices Act ("NMUP") prohibits both "unfair or deceptive trade

6    practices" and "unconscionable trade practices in the conduct of any trade or commerce."  N.M. Stat.

7    Ann. § 57-12-3.  Plaintiffs allege that defendants' conspiracy resulted in significant artificial increases

8    in the price of LCDs, which resulted in a "gross disparity" between the value received by the New

9    Mexico plaintiff and class and the prices paid by them for LCD.  IP-CAC ¶ 280(b).  The NMUP defines

10   an unconscionable trade practice as "an act or practice . . . which to a person's detriment: (1) takes

11   advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair

12   degree; or (2) results in a gross disparity between the value received by a person and the price paid."

13   N.M. Rev. Stat. § 57-12-2(E).

14   Defendants rely on *GPU*, in which Judge Alsup dismissed the indirect purchasers' claims under

15   the New Mexico statute.  However, unlike in *GPU*, plaintiffs here allege that as a result of defendants'

16   alleged price-fixing, there was a gross disparity in the value of products received and the amount that

17   they paid for those products.  Although not as factually specific as the allegations in *NMV*, the Court

18   finds that these allegations are sufficient as a matter of pleading to state a claim and accordingly

19   DENIES defendants' motions.

### 7.    New York Gen. Bus. Law § 349

22   In order to state a claim under Section 349, plaintiffs must allege "first, that the challenged act

23   or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the

24   plaintiff suffered injury as a result of the deceptive act."  *New York Jets LLC v. Cablevision Sys. Corp.*,

25   2005 WL 2649330, *11 (S.D.N.Y. Oct. 17, 2005).  Plaintiffs must "charge conduct of the defendant that

26   is consumer-oriented," *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85

27

28   _____

[8] Plaintiffs state that they inadvertently failed to identify the Nebraska Consumer Protection Act as the basis of their state law claim, and that they will amend to correct this error.

**United States District Court**
For the Northern District of California

N.Y.2d 20, 25 (N.Y. 1995), and must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *St. Patrick's Home for the Aged & Infirm v. Latricrete Int'l Inc.*, 264 A.D. 652, 655 (N.Y. App. Div. 1999). Defendants move to dismiss plaintiffs' claim under New York's General Business Law § 349 because the complaint does not specifically allege that defendants made any misrepresentations to the indirect plaintiffs. Defendants note that portions of the complaint that plaintiffs rely on all refer to an alleged agreement to fix the prices of TFT-LCD panels and allege that defendants made misrepresentations about the rise in prices for *panels*, not finished products. *See* IP-CAC ¶¶ 152, 228-35, 281.

Plaintiffs respond that they have sufficiently alleged "consumer-oriented" conduct because the complaint alleges a price-fixing scheme that resulted in New York consumers paying inflated prices for LCD panels and products, and that defendants took efforts to conceal their agreements from the New York plaintiffs and the indirect class. The Court finds that these allegations are similar to those that Judge Hamilton found sufficient in *DRAM II*, 536 F. Supp. 2d at 1143-44, and for the same reasons set forth in that order, the Court DENIES defendants' motion. *See id.* at 1143. ("[P]laintiffs need only allege – and ultimately show – that defendants' acts or practices have a broader impact on consumers at large."); *see also GPU I*, 527 F. Supp. 2d at 1030 (denying motion to dismiss claim under § 349 where "Plaintiffs have alleged at least in a conclusory fashion that defendants have engaged . . . in deceptive acts to conceal the alleged agreement to fix prices."); *cf SRAM*, Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Indirect Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint at 3-4 C 07-1819 (N.D. Cal. June 27, 2008) (denying motion to dismiss amended allegations under New York statute where plaintiffs alleged that "Defendants provided information that they knew would be seen by IP Plaintiffs and failed to provide other material information necessary to prevent the provided information from being misleading.").

### 8. Pennyslvania Const. Stat. § 201-9.2

Defendants move to dismiss the indirect plaintiffs' claims under Pennsylvania's consumer

United States District Court
For the Northern District of California

protection statute to the extent that these claims are brought on behalf of business entities .[9]  Defendants argue that this statute limits private actions to  "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes[.]"  73 Pa. Const. Stat. § 201-9.2.  Plaintiffs contend that business entities have standing to bring these claims because Pennsylvania's statute defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." 73 Pa. Const. Stat. § 201-2(2).

Defendants cite *Valley Forge Towers v. Ron-Ike F. Ins.*, 393 Pa. Super. 339 (Pa. Super. 1990), for the proposition that the Pennsylvania statute precludes a claim by one business against another business.  However, *Valley Forge*'s holding was not so broad.  Instead, *Valley Forge* held that the relevant inquiry was the purpose of the purchase, and that under the facts of *Valley Forge*, a condominium association acting in a representative capacity on behalf of unit owners could bring suit to challenge the purchase of a roof where the complaint alleged that "the condominium building upon which the roof was placed here, was primarily used for personal, family, or household residential use by the unit owners and/or their lessees." *Id*. at 355.  Thus, while it is generally true that a business entity will not have standing under the Pennsylvania statute because the purchases at issue must be "primarily for personal, family or household purposes," the Court cannot conclude as a *per se* rule that a business entity could never have standing to allege such a claim.  However, the Court recognizes the unusual facts of *Valley Forge*, and notes that it would be the rare exception that a business entity would have standing under the Pennsylvania statute.

Accordingly, the Court GRANTS defendants' motion in this respect but grants leave to amend. On amendment, if plaintiffs wish to include business entities in the proposed class, plaintiffs must be able to allege that such business entities made purchases "primarily for personal, family, or household purposes."

---

[9] The Court notes that because the consolidated amended complaint does not include any named plaintiffs from Pennsylvania, the parties' discussion of business entities' standing is largely hypothetical.

**United States District Court**
For the Northern District of California

1

### 9.    Rhode Island Gen. Laws §§ 6-13.1-1 *et seq.*

2      Rhode Island's Unfair Trade Practices and Consumer Protection Act ("UTPCPA"), R.I. Gen.

3   Laws § 6-1.1-1, *et seq.*, provides that "[u]nfair methods of competition and unfair or deceptive acts or

4   practices means any one or more of the following" 20 prohibited practices.  Defendants move to dismiss

5   plaintiffs' claim under the statute, contending that this statute requires plaintiffs to allege conduct that

6   "reasonably tend[s] to confuse and mislead the general public into purchasing [defendants'] product."

7   *ERI Max Entertainment v. Streisand*, 690 A.2d 1351, 1353-54 (R.I. 1997); *see also George v. George

8   F. Berkander, Inc.*, 169 A.2d 370, 371 (R.I. 1961) ("It is our well-settled law that a finding of unfair

9   competition must be predicated upon conduct on the part of the respondent that reasonably tended to

10  confuse and mislead the general public into purchasing his product when the actual intent of the

11  purchaser was to buy the product of the complainant.").

12     Here, plaintiffs allege that defendants "failed to disclose material facts" concerning

13  "[D]efendants' unlawful activities and artificially inflated prices for LCD" and "misrepresented to all

14  consumers during the Class Period that Defendants' LCD prices were competitive and fair.  IP-CAC ¶

15  284(c).   The complaint alleges that "[d]efendants owed a duty to disclose such facts, and considering

16  the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty

17  by their silence." *Id*.  The complaint also alleges that "Defendants' deception, including its affirmative

18  misrepresentations and omissions concerning the price of LCD, likely misled all consumers acting

19  reasonably under the circumstances to believe that they were purchasing LCD at prices born by a free

20  and fair market," and that Rhode Island consumers were harmed by being deprived of open and free

21  competition, and by paying supra-competitive prices.  *Id*. ¶ 284(d), (f).

22     The Court finds plaintiffs' allegations sufficient to state a claim under the Rhode Island statute.

23  Plaintiffs allege deceptive conduct creating a likelihood of confusion or misunderstanding on the part

24  of the average, non-business consumer.  *See SRAM*, June 27, 2008 Order at 7-8 (finding sufficient

25  allegations that consumers were misled or deceived to believe that they were paying a fair price for

26  SRAM or the price increases for SRAM were for valid business reasons); *DRAM II*, 536 F. Supp. 2d at

27  1145 (finding sufficient allegations that "defendants engaged in 'unfair or deceptive' acts or practices,

28  which 'mis[led] or deceive[d] members of the public'; and that Rhode Island consumers 'were injured

United States District Court
For the Northern District of California

by Defendants' actions.'"").  In finding the plaintiffs' allegations sufficient, Judge Hamilton relied on *Ames v. Oceanside Welding & Towing Company, Inc.*, 767 A.2d 677 (R.I. 2000), in which the Rhode Island Supreme Court, in considering whether a practice is "unfair" under the UTPCPA, looked at whether the practice offends public policy "as it has been established by statutes, the common law, or otherwise"; whether it is immoral, unethical, oppressive, or unscrupulous; and whether it causes substantial injury to consumers.  *Id.* at 681.  Judge Hamilton found that the plaintiffs' allegations satisfied that standard because they "set forth practices by defendants that are likely to offend public policy as has been established by statute and/or common law (e.g., statutory prohibitions on price-fixing) [and] . . . the second amended complaint fairly alleges unscrupulous conduct by defendants." *DRAM II*, 536 F. Supp. 2d at 1145.  As with the amended allegations in *DRAM II*, the Court finds that plaintiffs have sufficiently alleged conduct that is "unfair" as described in *Ames*.

Defendants also move to dismiss this claim to the extent that the indirect plaintiffs bring it on behalf of business entities.  Like the Pennyslvania statute, the Rhode Island statute limits claims to those based on purchases made "primarily for personal, family or household purposes."  Plaintiffs respond that the Rhode Island statute, like the Pennsylvania statute, defines "person" to include various types of business entities.  *See* R. I. Gen. Laws § 6-13.1-5.2(a).  Plaintiffs do not cite any authority to support their position that a business entity may bring a claim under the UTPCPA, and defendants cite a case strongly suggesting that one may not.  *See ERI Max Entertainment*, 574 A.2d at 647 (stating that video store "plainly does not have standing" to sue under statute).  Accordingly, the Court GRANTS defendants' motion in this respect.  However, because there may be unusual circumstances under which a business entity may be able to allege that its purchases were primarily for personal, family or household purposes, the Court will not preclude plaintiffs from amending the complaint to allege such a claim on behalf of business entities.

### 10.     West Virginia Code §§ 46A-6-101 *et seq.*

West Virginia's Consumer Credit and Protection Statute lists a number of "unfair methods of competition and unfair or deceptive acts or practices," including "[p]assing off goods or services as those of another"; "[u]sing deceptive representations or designations of geographic origin in connection

25

United States District Court
For the Northern District of California

with goods or services"; "[m]aking false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions"; and "[e]ngaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." W. Va. Code § 46A-6-102(7).  Defendants move to dismiss plaintiffs' claim under this statute, arguing that price-fixing is not included in the list of prohibited acts.  Defendants cite both *DRAM* and *GPU*, where the courts dismissed similar price-fixing claims under the West Virginia statute, holding that price-fixing was not encompassed by the act. *See GPU I*, 527 F. Supp. 2d at 1030; *DRAM I*, 516 F. Supp. 2d at 1118.

Plaintiffs argue that the West Virginia statute also contains a provisions stating that the act should be "liberally construed," and they cite two decisions from outside this District in which courts have allowed antitrust claims to go forward under the West Virginia law. *See Federal Trade Comm'n v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1, 10 (D.D.C. 1999) (granting reconsideration and permitting West Virginia Attorney General to proceed under statute for antitrust violations); *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 233 F.R.D. 229, 231 (D. Mass. 2006) (certifying class in antitrust case under West Virginia statute).  However, neither plaintiffs nor the two cases they rely provide any explanation or reasoning as to why the West Virginia statute covers price-fixing.  In addition, unlike the case with the District of Columbia or Rhode Island, plaintiffs have not cited any West Virginia authority broadly interpreting the West Virginia statute to encompass the type of conduct alleged here.  As the *DRAM* court noted,

> [R]eading the list literally, nothing on the list targets what might be called traditional antitrust conduct-e.g., price-fixing and market allocation such as that alleged by plaintiffs here, or conduct otherwise constituting a horizontal or vertical restraint on trade or commerce. Rather, the list is aimed at conduct that, in one way or another, "creates a likelihood of confusion or of misunderstanding" with respect to goods, services or businesses, or involves deceptive, false, or misleading statements and representations in connection with goods, services and businesses. *See id.* at § 46A-6-102(7)(A-P). While the WVCCP expressly states that the list of enumerated acts and practices is not meant to be exclusive, it is nonetheless clear that the statute is aimed at conduct different from the allegations of price-fixing asserted by plaintiffs here.

*DRAM I*, 516 F. Supp. 2d at 1118.  The Court agrees, and holds that plaintiffs may not bring a claim for price-fixing under the West Virginia Consumer Credit and Protection Statute.

United States District Court
For the Northern District of California

1

**F.      Indirect plaintiffs' Pennsylvania common law antitrust claim**

2       In support of their third claim for relief for violation of state antitrust laws, the indirect plaintiffs

3   alternatively allege that defendants violated "Pennsylvania common law." IP-CAC ¶ 261.  Defendants

4   move to dismiss this claim on the ground that there is no authority in Pennsylvania, common law or

5   otherwise, allowing for damages sustained as a result of antitrust violations.  *See XF Enterprises Inc.*

6   *v. BASF Corp.*, 47 Pa. D. & C. 4th 147, 150-51 (Pa. Comm. Pl. 2000) ("No court to date has held that

7   a private remedy is available for damages under Pennsylvania's common law on antitrust violations. .

8   . . Pennsylvania has no legislation which provides for these damages."); *see also DRAM*, 516 F. Supp.

9   2d at 1100 (dismissing Pennsylvania common law antitrust claim); *SRAM*, 2008 WL 426522, at *8

10  (same).

11      Plaintiffs' opposition does not address this claim or defendants' arguments, and thus the Court

12  concludes that plaintiffs have abandoned this claim.  The Court GRANTS defendants' motion to dismiss

13  this claim without leave to amend.

14

15      **G.      Statute of limitations**

16      Defendants move to dismiss plaintiffs' claims as time-barred under various state statutes of

17  limitations.  Defendants note that 23 jurisdictions impose an affirmative duty of diligence when there

18  is sufficient information available to arouse a plaintiff's suspicion.[10]  In four other states, a plaintiff

19  cannot toll the statute of limitations by claiming fraudulent concealment if she had actual or constructive

20  notice of the claim.[11]  Defendants argue that because the indirect plaintiffs allege a price-fixing

21  conspiracy beginning as early as 1996 based upon, *inter alia*, publicly available information such as

22  unusual price increases and public statements by industry executives, plaintiffs should have exercised

23  due diligence to investigate and discover their claims.

24      The Court finds that plaintiffs have sufficiently alleged fraudulent concealment such that, as a

25

26      [10] These jurisdictions are Arkansas, California, the District of Columbia, Florida, Iowa, Kansas,
    Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Hampshire, New Mexico, New
27  York, North Dakota, Pennsylvania, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia,
    and Wisconsin.

28      [11]  These states are Arizona, Hawaii, Nebraska, and North Carolina.

United States District Court
For the Northern District of California

pleading matter, the Court will not dismiss any claims as time-barred.[12]  As with the direct purchaser plaintiffs' consolidated complaint, the indirect purchaser plaintiffs' complaint alleges that defendants concealed their price-fixing conspiracy through secret discussions about price and output, an agreement not to discuss publicly the nature of their price-fixing agreement, and numerous pretextual and false justifications disseminated to consumers regarding defendants' price increases.  IP-CAC ¶¶ 226-34.  Defendants may renew their arguments regarding notice and due diligence in a motion for summary judgment upon a fuller factual record, as these are fact-intensive inquiries inappropriate for resolution at this preliminary stage of the litigation.  *See, e.g.*, *Baker v. Beech Air-Craft Corp.*, 39 Cal. App. 3d 315, 321 (1974) ("Whether a party has notice of 'circumstances sufficient to put a prudent man upon inquiry as to a particular fact,' and whether 'by prosecuting such inquiry, he might have learned such fact' when facts are susceptible to opposing inferences are themselves questions of fact to be determined by the jury or the trial court.").  Accordingly, the Court DENIES defendants' motion to dismiss the indirect plaintiffs' claims as time-barred.

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part defendants' motions to dismiss the direct purchaser plaintiffs' consolidated complaint, (Docket Nos. 460, 462, 463, 466, 474 & 484), and GRANTS in part and DENIES in part defendants' motions to dismiss the indirect purchaser plaintiffs' consolidated complaint.  (Docket Nos. 461, 462, 463, 466, 469, 474)  The Court GRANTS defendants' request for judicial notice.  (Docket No. 622).  Plaintiffs shall file their amended consolidated complaints no later than November 28, 2008.

**IT IS SO ORDERED.**

Dated: August 25, 2008

_____
SUSAN ILLSTON
United States District Judge

---

[12]  Plaintiffs concede that fraudulent concealment does not exist under the laws of Puerto Rico, and thus any claims under Puerto Rico law are limited to the statute of limitations period.